## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| LESLEY BUSBY,<br>　　　　　　Plaintiff, | §<br>§<br>§ | |
| V. | §<br>§ | CIVIL ACTION NO. 3:26-CV-2183 |
| D MAGAZINE PARTNERS, L.P.,<br>　　　　　　Defendant. | §<br>§<br>§ | |

---

### PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND

---

**TO THE HONORABLE JUDGE OF SAID COURT:**

**NOW COMES** Plaintiff, Lesley Busby ("Plaintiff"), and files this Original Complaint against Defendant D Magazine Partners, L.P. ("Defendant"), and respectfully shows the Court as follows:

### PARTIES AND SERVICE

1.　　　　Plaintiff, Lesley Busby ("Plaintiff"), is an individual and resident of Dallas County, Texas.

2.　　　　Defendant D Magazine Partners, L.P. ("Defendant") is a Texas limited partnership doing business in Dallas County, Texas. Defendant may be served through its registered agent for service of process, Allison Media, Inc., 750 North St. Paul Street, Suite 2100, Dallas, Texas 75201. Citation is requested. ***Issuance of a summons is hereby requested.***

### JURISDICTION & VENUE

3.　　　　This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff asserts claims arising under Title VII of the Civil Rights Act of 1964. This Court has supplemental jurisdiction over Plaintiff's claims arising under Chapter 21 of the Texas Labor Code

pursuant to 28 U.S.C. § 1367 because those claims arise from the same nucleus of operative facts.

4.     Venue is proper in the Northern District of Texas pursuant to 28 U.S.C. § 1391(b) because Defendant conducts business in this District, Plaintiff was employed by Defendant in this District, and the unlawful employment practices alleged herein occurred in Dallas County, Texas, which lies within the Dallas Division of the Northern District of Texas.

## NATURE OF ACTION

5.     This is an employment discrimination action brought under Title VII of the Civil Rights Act of 1964 and Chapter 21 of the Texas Labor Code. Plaintiff seeks relief for race discrimination, sex discrimination, retaliation, and a hostile work environment. Defendant discriminated against Plaintiff because of her protected characteristics, retaliated against her after she opposed unlawful employment practices and advocated for herself and other employees, subjected her to a hostile work environment, and ultimately terminated her employment in violation of federal and Texas law.

## CONDITIONS PRECEDENT

6.     All conditions precedent to the filing of this lawsuit have occurred or have been performed. Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission within the time prescribed by law. The EEOC issued Plaintiff a Notice of Right to Sue on May 1, 2026, and Plaintiff has filed this action within ninety (90) days of receipt of that Notice.

## STATEMENT OF FACTS

7.     Plaintiff Lesley Busby is an accomplished graphic designer and creative professional with more than twenty years of experience in publishing, editorial design, brand management, and visual storytelling. Throughout her career, Plaintiff has held leadership positions

with nationally recognized publications and media organizations, including D Magazine, Health Magazine, and numerous publishing and marketing firms.

8.      Prior to the events giving rise to this lawsuit, Plaintiff had successfully worked for Defendant on two separate occasions between 2002 and 2007. During those periods of employment, Plaintiff established a positive reputation, maintained productive working relationships with management, and left Defendant in good standing.

9.      In February 2022, Defendant recruited Plaintiff to return to D Magazine for a third time, this time as Creative Director. The position represented a significant promotion from Plaintiff's previous roles and placed her in charge of the publication's overall creative direction, visual design, and production.

10.     Plaintiff was hired because of her extensive experience, creative vision, and demonstrated ability to improve the quality, reputation, and marketability of Defendant's publications. Among other responsibilities, Plaintiff was expected to diversify creative contributors, elevate the visual identity of the magazine, mentor creative staff, and improve Defendant's industry recognition.

11.     During Plaintiff's tenure as Creative Director, Defendant received numerous industry award nominations recognizing Plaintiff's design work, including nominations for cover design, feature design, illustration, and overall creative excellence.

12.     Shortly after Plaintiff began her employment, Defendant underwent changes in editorial leadership and organizational structure. Plaintiff's reporting relationship changed from the individual who hired her to Editorial Director Kathy Wise.

13.     Plaintiff consistently received positive feedback regarding her creative vision, leadership, and design work. Defendant entrusted Plaintiff with significant creative authority and

continued expanding Plaintiff's responsibilities throughout her employment, demonstrating Defendant's confidence in Plaintiff's abilities prior to the events giving rise to this lawsuit.

14.    Plaintiff expressed concerns regarding this change in supervision and sought clarification regarding her reporting structure. Despite those concerns, Defendant never clearly established expectations, regularly scheduled supervisory meetings, or implemented a consistent management process for Plaintiff comparable to that provided to other employees.

15.    Plaintiff nevertheless continued performing her duties and repeatedly attempted to improve Defendant's editorial workflow, production scheduling, staffing, and communication among departments.

16.    Plaintiff routinely worked extended hours, frequently arrived before other members of her department, managed multiple publication cycles simultaneously, and assumed responsibilities beyond those originally assigned to her position. Plaintiff requested additional staffing, workflow improvements, and project management resources to address these recurring issues.

17.    Defendant acknowledged staffing shortages and eventually approved limited freelance assistance for Plaintiff's department. However, Defendant failed to provide Plaintiff with the level of staffing and operational support necessary to perform the responsibilities assigned to the Creative Director position.

18.    Despite Plaintiff's repeated efforts to improve Defendant's production processes, Defendant continued requiring Plaintiff to work simultaneously on current and future publication cycles without providing adequate staffing or operational support.

19.    Rather than ignore the operational challenges facing Defendant's publications, Plaintiff repeatedly proposed solutions, identified workflow inefficiencies, requested additional

staffing, and attempted to improve communication between editorial and production departments. Instead of addressing those concerns, Defendant increasingly blamed Plaintiff for systemic problems affecting multiple departments.

20. Throughout her employment, Plaintiff became increasingly concerned about Defendant's treatment of minority employees and the overall workplace environment.

21. In or around March 2024, Defendant planned to republish a historical article entitled *The Cement Prairie*. Plaintiff believed that portions of the article contained racially offensive language and imagery and raised concerns regarding the publication of the article with Defendant's management.

22. Plaintiff's concerns were made in good faith and constituted protected activity in opposition to what Plaintiff reasonably believed were discriminatory employment practices and racially offensive workplace conduct.

23. Defendant ultimately decided not to republish the article in print and added editorial context to the archived version after Plaintiff and another employee objected to its publication. Defendant's own position statement acknowledges that Plaintiff raised these concerns and that management met with Plaintiff regarding the issue.

24. Plaintiff also advocated on behalf of Defendant's Diversity, Equity, and Inclusion (DEI) initiatives and defended the continued existence of Defendant's DEI committee after management sought to eliminate or reduce those efforts.

25. Plaintiff further advocated for minority employees who expressed concerns regarding disparate treatment, workplace fairness, and discrimination. Minority employees sought Plaintiff's assistance because they trusted Plaintiff to address concerns they believed management had ignored.

26.    Plaintiff became a trusted resource for minority employees who believed their concerns regarding workplace treatment were not being adequately addressed by management. Plaintiff relayed those concerns through Defendant's reporting structure in an effort to improve the workplace and ensure equal treatment for all employees.

27.    Following Plaintiff's repeated complaints concerning race-related issues and her advocacy for minority employees, Defendant's treatment of Plaintiff materially changed. Plaintiff was subjected to increased scrutiny, heightened criticism, hostility, and treatment materially different from that afforded to similarly situated employees. Defendant also undermined Plaintiff's authority and increasingly questioned her professional judgment.

28.    Plaintiff was assigned additional responsibilities, denied scheduling flexibility afforded to other creative leaders, and was increasingly blamed for systemic production issues outside of her control.

29.    Plaintiff also observed that other creative directors routinely worked remotely while Plaintiff maintained one of the highest in-office presences among Defendant's creative leadership team.

30.    Defendant increasingly attributed production delays to Plaintiff despite Plaintiff's repeated communications that many delays originated with editorial leadership and missed editorial deadlines.

31.    At no time before Plaintiff engaged in protected activity did Defendant issue discipline suggesting Plaintiff's performance placed her employment in jeopardy. Plaintiff alleges Defendant's criticisms escalated only after Plaintiff opposed practices she reasonably believed to be discriminatory.

32.    Despite Defendant's later criticisms, Plaintiff was never placed on a performance

improvement plan, never advised that her employment was in imminent jeopardy, and was never afforded a meaningful opportunity to correct the alleged deficiencies before Defendant decided to terminate her employment.

33.    In June 2024, Defendant terminated Plaintiff's employment.

34.    At the time of Plaintiff's termination, Defendant informed Plaintiff that her employment was being ended and subsequently offered Plaintiff a severance agreement.

35.    Defendant later asserted that Plaintiff's termination resulted from alleged performance deficiencies, including missed deadlines, communication issues, and insubordination.

36.    Plaintiff denies Defendant's stated reasons for her termination and alleges that those reasons are false, inconsistent, and pretextual.

37.    Plaintiff had successfully worked for Defendant during two prior periods of employment, was specifically recruited to return as Creative Director because of her experience, leadership, and reputation, received industry recognition during her tenure, and consistently attempted to solve Defendant's operational challenges. These facts are inconsistent with Defendant's contention that Plaintiff suddenly became an unsatisfactory employee shortly before her termination.

38.    Defendant's criticism of Plaintiff intensified only after Plaintiff repeatedly opposed practices she reasonably believed were discriminatory, advocated on behalf of minority employees, objected to racially offensive content, and defended Defendant's Diversity, Equity, and Inclusion initiatives.

39.    At all relevant times, Plaintiff sought to improve Defendant's operations rather than undermine them. Plaintiff's repeated complaints regarding workflow deficiencies, staffing shortages, and race-related concerns were intended to improve Defendant's workplace and

publications, not to disrupt them.

40. Before Plaintiff engaged in protected activity concerning race-related issues and the treatment of minority employees, Defendant valued Plaintiff's leadership, expanded her responsibilities, and praised her work. Only after Plaintiff repeatedly opposed practices she reasonably believed to be discriminatory did Defendant begin portraying Plaintiff as a performance problem.

41. Plaintiff alleges Defendant's stated reasons for her termination were false and pretextual. Plaintiff further alleges Defendant terminated her because of her race and because she repeatedly engaged in protected activity by opposing practices she reasonably believed violated Title VII.

42. Plaintiff further alleges Defendant's explanations for her termination have evolved over time and rely on generalized criticisms that are inconsistent with Plaintiff's documented accomplishments, Defendant's repeated reliance on Plaintiff's leadership, and Defendant's acknowledgment of the operational problems affecting multiple departments.

## SEX DISCRIMINATION (TITLE VII)

43. Plaintiff incorporates all preceding paragraphs herein.

44. Title VII of the Civil Rights Act of 1964 (the "Act") makes it unlawful to discriminate against someone on the basis of race, color, national origin, sex (including pregnancy, sexual orientation, and gender identity) or religion. The Act prohibits not only intentional discrimination, but also practices that have the effect of discriminating against individuals because of their race, color, national origin, religion, or sex.

45. To establish a prima facie case of discrimination, a plaintiff must show that: (1) the plaintiff belongs to a protected class; (2) the plaintiff was qualified for his position; (3) the plaintiff,

despite being qualified, was rejected; plaintiff experienced an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). "[T]he phrase 'terms, conditions, or privileges of employment' evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women' in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment." *Harris*, 510 U.S. at 21 (quoting *Meritor*, 477 U.S. at 64). *Gardner v. CLC of Pascagoula, L.L.C.*, 915 F.3d 320, 325 (5th Cir. 2019).

46.     The phrase "terms, conditions, or privileges of employment" evinces a congressional intent "to strike at the entire spectrum of disparate treatment of men and women" in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)); *Gardner v. CLC of Pascagoula, L.L.C.*, 915 F.3d 320, 325 (5th Cir. 2019).

47.     The case law is clear. A plaintiff must establish a prima facie case of discrimination. If the plaintiff establishes a prima facie case, the burden then shifts to the defendant to articulate some legitimate nondiscriminatory reason for its employment decision. If the defendant articulates a legitimate nondiscriminatory reason, then, the plaintiff, in order to prevail, must demonstrate that the employer's alleged reason for the adverse employment decision is a pretext for another motive which is discriminatory. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

48.     Plaintiff is a member of a protected class because she is female.

49.     Plaintiff was qualified for the position of Creative Director. Defendant specifically

recruited Plaintiff to return to D Magazine for a third time because of her extensive publishing experience, creative leadership, and demonstrated success with the organization. During her employment, Plaintiff received industry recognition for her work and successfully fulfilled many of the objectives for which she had been hired, including elevating the publication's design, mentoring creative staff, and earning multiple industry award nominations.

50.     Plaintiff suffered adverse employment actions, including heightened scrutiny, increased criticism, unequal treatment in the terms and conditions of her employment, and ultimately the termination of her employment.

51.     Throughout Plaintiff's employment, Defendant subjected Plaintiff to unequal treatment in the performance of her duties. Plaintiff was assigned additional responsibilities, expected to manage multiple publication cycles simultaneously, and repeatedly requested additional staffing and operational support necessary to perform her responsibilities. Despite those requests, Defendant failed to provide Plaintiff with adequate resources while continuing to criticize her performance for systemic production issues outside of her control.

52.     Plaintiff further alleges that Defendant's stated reasons for her termination are false and pretextual. Defendant contends Plaintiff was terminated because of performance deficiencies, missed deadlines, communication problems, and insubordination. Plaintiff alleges that many of the production delays cited by Defendant originated with missed editorial deadlines, staffing shortages, workflow deficiencies, and management decisions outside Plaintiff's control, all of which Plaintiff repeatedly brought to Defendant's attention.

53.     Defendant's explanation is further undermined by the fact that Defendant specifically recruited Plaintiff into a senior leadership position, repeatedly relied upon her creative leadership, recognized her work through industry accolades, and continued assigning Plaintiff

significant responsibilities before abruptly characterizing her as an unsatisfactory employee.

54.     Defendant's asserted reasons for Plaintiff's termination were not the true reasons for its actions but were instead a pretext for unlawful sex discrimination.

55.     Viewed as a whole, Plaintiff alleges Defendant first valued and relied upon her leadership, then progressively marginalized, criticized, and ultimately terminated her employment. Defendant's asserted performance-based explanations were a pretext for unlawful sex discrimination.

56.     As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered lost wages, lost employment benefits, emotional pain, suffering, mental anguish, inconvenience, damage to her professional reputation, and other compensatory damages.

## RACE AND COLOR DISCRIMINATION (TITLE VII)

57.     Plaintiff incorporates all preceding paragraphs herein.

58.     Title VII of the Civil Rights Act of 1964 (the "Act") makes it unlawful to discriminate against someone on the basis of race, color, national origin, sex (including pregnancy, sexual orientation, and gender identity) or religion. The Act prohibits not only intentional discrimination, but also practices that have the effect of discriminating against individuals because of their race, color, national origin, religion, or sex.

59.     To establish a prima facie case of discrimination, a plaintiff must show that: (1) the plaintiff belongs to a protected class; (2) the plaintiff was qualified for his position; (3) the plaintiff, despite being qualified, was rejected; plaintiff experienced an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). "[T]he phrase 'terms,

conditions, or privileges of employment' evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women' in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment." *Harris*, 510 U.S. at 21 (quoting *Meritor*, 477 U.S. at 64). *Gardner v. CLC of Pascagoula, L.L.C.*, 915 F.3d 320, 325 (5th Cir. 2019).

60.     The phrase "terms, conditions, or privileges of employment" evinces a congressional intent "to strike at the entire spectrum of disparate treatment of men and women" in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)); *Gardner v. CLC of Pascagoula, L.L.C.*, 915 F.3d 320, 325 (5th Cir. 2019).

61.     The case law is clear. A plaintiff must establish a prima facie case of discrimination. If the plaintiff establishes a prima facie case, the burden then shifts to the defendant to articulate some legitimate nondiscriminatory reason for its employment decision. If the defendant articulates a legitimate nondiscriminatory reason, then, the plaintiff, in order to prevail, must demonstrate that the employer's alleged reason for the adverse employment decision is a pretext for another motive which is discriminatory. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

62.     Plaintiff is a member of a protected class because she is an African American woman.

63.     Plaintiff was qualified for the position of Creative Director. Defendant specifically recruited Plaintiff to return to D Magazine for a third time because of her extensive experience, creative leadership, and demonstrated success with the organization. During Plaintiff's tenure, she

fulfilled the responsibilities for which she was hired, received industry recognition for her creative work, and was entrusted with directing the visual identity of Defendant's flagship publication.

64.     Plaintiff suffered adverse employment actions, including increased scrutiny, disparate treatment, undermining of her authority, heightened criticism, interference with her ability to perform her job responsibilities, and ultimately the termination of her employment.

65.     Throughout Plaintiff's employment, Defendant increasingly subjected Plaintiff to unequal terms and conditions of employment after Plaintiff advocated for racial equity within the workplace, opposed racially offensive content, and raised concerns regarding the treatment of minority employees.

66.     Plaintiff objected to Defendant's planned republication of The Cement Prairie, believing that the publication contained racially offensive language and imagery that would negatively impact minority employees and readers. Plaintiff communicated those concerns directly to Defendant's leadership. Defendant subsequently altered its handling of the publication by declining to republish it in print and by adding explanatory editorial language to the archived version.

67.     Plaintiff also advocated on behalf of Black employees and other minority employees who expressed concerns regarding workplace treatment. Plaintiff raised concerns involving Jasmine Green and other employees because she believed management should investigate perceived disparities in treatment. Plaintiff expressly advised management that she was requesting an investigation and was not making unsupported accusations of racism.

68.     Minority employees regularly sought Plaintiff's guidance and assistance because they believed Plaintiff would advocate for them when management failed to address their

concerns. Plaintiff became an informal advocate for minority employees within Defendant's organization.

69.    Plaintiff further supported Defendant's Diversity, Equity, and Inclusion initiatives and opposed efforts to diminish or eliminate those initiatives. Plaintiff reasonably believed Defendant's commitment to diversity was inconsistent with the treatment experienced by minority employees and communicated those concerns to management.

70.    Following Plaintiff's repeated advocacy concerning race-related issues, Defendant's treatment of Plaintiff changed materially. Plaintiff was subjected to heightened scrutiny, her judgment was repeatedly questioned, her authority as Creative Director was undermined, and Defendant increasingly attributed systemic workflow failures to Plaintiff despite Plaintiff's repeated efforts to identify and correct organizational deficiencies.

71.    Defendant's explanation for Plaintiff's termination has shifted over time and is inconsistent with Plaintiff's qualifications, Defendant's decision to recruit Plaintiff into senior leadership, Plaintiff's documented accomplishments, and Defendant's acknowledgment that Plaintiff repeatedly raised concerns regarding racial issues in the workplace. These inconsistencies further support Plaintiff's allegation that Defendant's stated reasons are pretextual.

72.    Defendant contends Plaintiff's termination resulted from alleged performance deficiencies. Plaintiff alleges that Defendant's explanation is false and pretextual. The alleged performance deficiencies largely resulted from editorial staffing shortages, missed editorial deadlines, workflow failures, and management decisions outside Plaintiff's control, all of which Plaintiff repeatedly communicated to Defendant before her termination.

73.    Defendant's stated reasons are further undermined by its own conduct. Defendant specifically recruited Plaintiff because of her experience, entrusted her with one of the

organization's highest creative positions, recognized her work during her employment, and continued assigning Plaintiff significant responsibilities even as it later characterized Plaintiff as an unsatisfactory employee. Plaintiff further alleges that Defendant ignored the same operational deficiencies when committed by others while disproportionately attributing those failures to Plaintiff.

74.    Defendant's own position statement acknowledges that Plaintiff raised concerns regarding The Cement Prairie, participated in meetings concerning race-related issues, and advocated for matters involving diversity and minority employees. Rather than viewing those activities as protected conduct, Defendant increasingly characterized Plaintiff as disruptive and ultimately terminated her employment.

75.    The timing of Defendant's actions, Defendant's shifting explanations, Plaintiff's advocacy concerning race-related issues, Defendant's treatment of minority employees, and Defendant's disparate treatment of Plaintiff give rise to a reasonable inference that Plaintiff's race and color were motivating factors in Defendant's decision to subject Plaintiff to adverse employment actions and ultimately terminate her employment.

76.    After Plaintiff became an outspoken advocate regarding race-related issues in the workplace, Defendant treated Plaintiff differently from similarly situated employees. This disparate treatment supports a reasonable inference that Plaintiff's race and protected activity were motivating factors in Defendant's decision-making.

77.    As a direct and proximate result of Defendant's unlawful discrimination, Plaintiff has suffered lost wages, lost employment benefits, emotional pain and suffering, mental anguish, humiliation, damage to her professional reputation, and other compensatory damages recoverable under Title VII.

**RETALIATION (TITLE VII)**

78.     Plaintiff incorporates all preceding paragraphs.

79.     Title VII of the Civil Rights Act of 1964 (the "Act") prohibits retaliation against an employee who reports or opposes race or color discrimination. It is unlawful to retaliate against applicants or employees for communicating with a supervisor or manager about employment discrimination, including harassment. Retaliation can take the form of a reprimand; giving a performance evaluation that is lower than it should be; engaging in physical or verbal abuse; increased scrutiny; and making the employee's work more difficult.  A plaintiff establishes a claim for retaliation when [s]he, "engaged in an activity protected by Title VII; 2) was subjected to an adverse employment action; and 3) a causal link exists between the protected activity and the adverse employment action." *Adams v. Vaughn*, No. 3:18-CV-1109-B-BT, 2019 WL 1003845, at *3 (N.D. Tex. Feb. 12, 2019)(quoting *Wright v. Chevron Philips Chem. Co.*, 734 F. App'x 931, 935 (5th Cir. 2018)(per curiam)). Protected activity includes complaining to supervisors about acts of unlawful discrimination. 42 U.S.C. §2000e-3(a); *Valdarez v. Lubbock Cty. Hosp. Dist.*, 611 Fed. Appx. 816, 820-21 (5th Cir. 2015)(finding that the plaintiff's report of sexual harassment to his supervisor was protected activity).

80.     Title VII states that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 2000e-3(a).

81.     *McDonnell Douglas* provides the burden-shifting framework for claims of unlawful retaliation under Title VII. *Sherrod v. Am. Airlines, Inc.*, 132 F.3d 1112, 1112 (5th Cir. 1998).  It says that "to show an unlawful retaliation, a plaintiff must establish a prima facie case of (1)

engagement in an activity protected by Title VII, (2) an adverse employment action, and (3) a causal connection between the protected act and the adverse action." *Nall v. BNSF Ry. Co.*, 917 F.3d 335, 348−49 (5th Cir. 2019) (quoting *Seaman v. CSPH, Inc.*, 179 F.3d 297, 301 (5th Cir. 1999)); *see also Credeur*, 860 F.3d at 797 (same). If "the plaintiff has established a prima facie case, the defendant must come forward with a legitimate, non-discriminatory reason for the adverse employment action." *Nall*, 917 F.3d 335, 349 (5th Cir. 2019) (quoting Seaman, 179 F.3d at 301). If the defendant does so, "the plaintiff must adduce sufficient evidence that the proffered reason is a pretext for retaliation. Ultimately, the employee must show that 'but for' the protected activity, the adverse employment action would not have occurred." *Id*.

82. Plaintiff engaged in activity protected by Title VII by repeatedly opposing what she reasonably believed to be unlawful race discrimination and discriminatory employment practices within Defendant's workplace.

83. Among other protected activities, Plaintiff objected to Defendant's planned republication of *The Cement Prairie*, which Plaintiff reasonably believed contained racially offensive content. Plaintiff communicated her concerns directly to Defendant's management, resulting in management meetings regarding the publication and Defendant's decision not to republish the article in print. Defendant's own position statement acknowledges that Plaintiff complained about the article and that management responded to those complaints.

84. Plaintiff also repeatedly advocated on behalf of Black employees and other minority employees who expressed concerns regarding unequal treatment within Defendant's workplace. Plaintiff raised concerns involving Jasmine Green and other employees, requested that management investigate perceived disparities, and communicated her concerns through Defendant's management structure.

85.     Plaintiff further opposed Defendant's treatment of its Diversity, Equity, and Inclusion initiatives and advocated for the continuation of those efforts. Plaintiff believed Defendant's public commitment to diversity was inconsistent with its internal treatment of minority employees and communicated those concerns to management. Defendant's position statement acknowledges Plaintiff's involvement in defending Defendant's DEI committee.

86.     Plaintiff's opposition to what she reasonably believed to be discriminatory practices constituted protected activity under Title VII.

87.     After Plaintiff engaged in protected activity, Defendant's treatment of Plaintiff materially changed. Defendant subjected Plaintiff to increased scrutiny, undermined her authority as Creative Director, assigned her additional responsibilities without corresponding support, criticized her performance for operational issues outside of her control, and increasingly interfered with her ability to perform her job successfully.

88.     Plaintiff was also subjected to heightened monitoring, increased criticism, and adverse treatment that was materially different from the treatment she had experienced before engaging in protected activity.

89.     Defendant had actual knowledge of Plaintiff's protected activity because Plaintiff communicated her concerns directly to supervisory and executive personnel. Defendant cannot credibly claim ignorance of Plaintiff's opposition to practices she reasonably believed violated Title VII.

90.     Rather than addressing Plaintiff's race-related concerns, Defendant increasingly blamed Plaintiff for organizational problems, subjected Plaintiff to heightened criticism, and undermined Plaintiff's credibility and authority.

91.     Defendant ultimately terminated Plaintiff's employment in June 2024.

92.    Defendant asserts that Plaintiff was terminated because of alleged performance deficiencies, communication problems, missed deadlines, and insubordination. Plaintiff alleges those explanations are false and pretextual. Plaintiff repeatedly informed Defendant that many of the production delays originated from missed editorial deadlines, inadequate staffing, workflow deficiencies, and management decisions outside Plaintiff's control. Plaintiff consistently sought to remedy those issues by requesting additional personnel, workflow improvements, and operational support.

93.    The temporal relationship between Plaintiff's protected activity and the escalation of Defendant's criticism, together with Defendant's shifting explanations for Plaintiff's termination and the surrounding circumstances, support a reasonable inference that Defendant retaliated against Plaintiff because she opposed practices she reasonably believed violated Title VII.

94.    Defendant's own acknowledgment that Plaintiff repeatedly raised concerns regarding The Cement Prairie, Diversity, Equity, and Inclusion initiatives, and the treatment of minority employees establishes Defendant's awareness of Plaintiff's protected activity. Plaintiff alleges Defendant's adverse actions followed those protected activities and were motivated by them.

95.    But for Plaintiff's repeated complaints regarding race discrimination, racially offensive content, the treatment of minority employees, and Defendant's Diversity, Equity, and Inclusion practices, Defendant would not have subjected Plaintiff to increased scrutiny, materially adverse treatment, and termination.

96.    As a direct and proximate result of Defendant's retaliation, Plaintiff has suffered lost wages, lost employment benefits, emotional pain and suffering, mental anguish,

inconvenience, damage to her professional reputation, and other compensatory damages recoverable under Title VII.

## HOSTILE WORK ENVIRONMENT (TCHRA)

97.  Plaintiff incorporates all preceding paragraphs herein as if set forth at length.

98.  Plaintiff asserts a violation of Tex. Lab. Code 21.051 under the Texas Commission on Human Rights Act (TCHRA). The code states:

> "An employer commits an unlawful employment practice if because of race, color, disability, religion, sex, national origin, or age the employer:
>
> (1) fails or refuses to hire an individual, discharges an individual, or discriminates in any other manner against an individual in connection with compensation or the terms, conditions, or privileges of employment; or
>
> (2) limits, segregates, or classifies an employee or applicant for employment in a manner that would deprive or tend to deprive an individual of any employment opportunity or adversely affect in any other manner the status of an employee."

99.  A hostile-work-environment claim is designed to address conduct that is so severe or pervasive that it destroys an employee's opportunity to succeed in the workplace. *Gardner*, 414 S.W.3d at 382 (citing *City of Houston v. Fletcher*, 166 S.W.3d 479, 489 (Tex. App. Eastland 2005, pet. denied)).

100.  To succeed on a TCHRA claim of hostile work environment, the complained-of conduct must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Waffle House, Inc.*, 313 S.W.3d at 806 (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986)).

101.  Throughout Plaintiff's employment, Defendant subjected Plaintiff to a hostile work environment because of her race and color and because she opposed what she reasonably believed to be discriminatory employment practices.

102.   Viewed collectively rather than in isolation, Defendant's repeated criticism, heightened scrutiny, undermining of Plaintiff's authority, dismissal of Plaintiff's race-related concerns, and continued hostility following Plaintiff's protected activity created an abusive work environment that materially altered the terms and conditions of Plaintiff's employment.

103.   After Plaintiff objected to racially offensive content, advocated for Black employees, supported Defendant's Diversity, Equity, and Inclusion initiatives, and raised concerns regarding the treatment of minority employees, Defendant's management began treating Plaintiff differently from before she engaged in those protected activities.

104.   Defendant repeatedly undermined Plaintiff's authority as Creative Director by scrutinizing Plaintiff's work more heavily, assigning additional responsibilities without adequate support, criticizing Plaintiff for operational failures outside her control, and failing to provide the staffing and resources necessary for Plaintiff to perform her position successfully.

105.   Plaintiff repeatedly informed Defendant that production delays resulted from systemic editorial workflow deficiencies, missed editorial deadlines, and staffing shortages. Rather than addressing those issues, Defendant increasingly blamed Plaintiff for organizational problems that affected multiple departments.

106.   Plaintiff also alleges that Defendant's management dismissed or minimized Plaintiff's concerns regarding the treatment of minority employees. When Plaintiff expressed concern that Black employees were experiencing disparate treatment and requested that management investigate those circumstances, management responded dismissively rather than conducting a meaningful inquiry.

107.   As the workplace environment deteriorated, Plaintiff was subjected to persistent criticism, heightened scrutiny, interference with her ability to perform her responsibilities, and

repeated efforts to undermine her credibility and professional judgment. These actions occurred over an extended period leading up to Plaintiff's termination.

108.    Defendant's conduct was not limited to isolated workplace disagreements or ordinary supervisory criticism. Instead, the conduct was continuous, pervasive, and materially altered the terms and conditions of Plaintiff's employment by making it substantially more difficult for Plaintiff to perform the duties of her position and succeed in the workplace.

109.    Defendant knew, or reasonably should have known, that Plaintiff believed she was being subjected to discrimination and a hostile work environment. Plaintiff repeatedly communicated her concerns to Defendant's management and human resources personnel. Despite having notice of Plaintiff's concerns, Defendant failed to take prompt and effective corrective action.

110.    Instead of remedying the hostile work environment, Defendant permitted the conduct to continue and ultimately terminated Plaintiff's employment.

111.    Defendant's actions were sufficiently severe and pervasive to alter the conditions of Plaintiff's employment, interfere with Plaintiff's ability to perform her job, and create an objectively and subjectively hostile, intimidating, and abusive work environment in violation of the Texas Commission on Human Rights Act.

112.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered lost wages, emotional pain and suffering, mental anguish, and humiliation.

## RESPONDEAT SUPERIOR AND RATIFICATION

113.    Whenever in this complaint it is alleged that the Defendants did any act or thing, it is meant that the Defendants' officers, agents, servants, employees or representatives did such act and/or that at that time such act was done, it was done with the full authorization or ratification of

the Defendants or was done in the normal and routine course and scope of employment of Defendants' officers, agents, servants, employees, or representatives.

## DAMAGES

114.    Plaintiff sustained the following damages as a result of the actions and/or omissions of Defendant described hereinabove:

a.    Back pay from the date of Plaintiff's termination and interest on the back pay in an amount to compensate Plaintiff as the Court deems equitable and just;

b.    All reasonable and necessary costs incurred in pursuit of this suit;

c.    Front pay in an amount the Court deems equitable and just to make Plaintiff whole;

d.    Inconvenience;

e.    Interest;

f.    Mental anguish in the past;

g.    Mental anguish in the future;

h.    Loss of benefits;

i.    Compensatory damages for emotional pain, suffering, inconvenience, mental anguish (past and future), and loss of enjoyment of life;

j.    Punitive damages as permitted under Title VII;

k.    Prejudgment and post-judgment interest as allowed by law;

l.    Reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

m.    Any and all other relief to which Plaintiff may show herself justly entitled.

## SPECIFIC RELIEF

115.    Plaintiff seeks the following specific relief which arises out of the actions and/or omissions of Defendant described hereinabove:

a.    Neutral job reference;

b.    An injunction against Defendants prohibiting discriminatory employment practices on the basis of race, color, and protected activity;

c.    Reinstatement to Plaintiff's former position, or alternatively, an award of front pay in lieu of reinstatement;

d.    An order requiring Defendant to implement training for all managerial personnel on race discrimination, retaliation, and employee rights under Title VII and Chapter 21 of the Texas Labor Code; and

e.    Such other and further equitable relief as the Court deems just and proper to fully redress the harm suffered by Plaintiff.

## PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff, Lesley Busby, respectfully prays that Defendant be cited to appear and answer herein and that, upon final trial, Plaintiff recover judgment against Defendant for all damages, equitable relief, attorneys' fees, costs of court, interest as allowed by law, all relief available under Title VII of the Civil Rights Act of 1964 and Chapter 21 of the Texas Labor Code, and such other and further relief, at law or in equity, to which Plaintiff may be justly entitled.

**PLAINTIFF HEREBY DEMANDS TRIAL BY JURY.**

Respectfully submitted,

/s/ Ali Crocker Russell
Ali Crocker Russell
State Bar No. 24098868
ali@cralawfirm.com

CROCKER RUSSELL & ASSOCIATES
200 W. Oak Street
Mansfield, Texas 76063
Tel: (817) 482-6570
Fax: (682) 232-1850

**ATTORNEY FOR PLAINTIFF**